IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

LEXISNEXIS RISK AND
INFORMATION ANALYTICS
GROUP INC.,

REED ELSEVIER INC., and

SEISINT, INC.,

          Plaintiffs,

v.

PAUL COLANGELO,

          Defendant.

_____/

## 07-80486
## CIV-MIDDLEBROOKS
MAGISTRATE
JOHNSON

FILED by_____D.C.

JUN - 6 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. PIERCE

### VERIFIED COMPLAINT FOR
### INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs LexisNexis Risk and Information Analytics Group Inc. ("LN Risk"),
Reed Elsevier Inc., and Seisint, Inc. ("Seisint") (collectively Plaintiffs are referred to as
"LN Risk & Information Group"), by counsel, state for their Complaint against
Defendant Paul Colangelo ("Colangelo") as follows:

### INTRODUCTION

1.     Plaintiffs LN Risk & Information Group seek temporary and permanent
injunctive relief enforcing defendant Paul Colangelo's August 31, 2000 covenant not to
compete (Exhibit 2), enjoining Colangelo from serving as President, Chief Executive
Officer, and member of the Board of Directors of LocatePlus Holdings Corporation, a
competitor of LN Risk & Information Group ("LocatePlus"), enjoining Colangelo from
disclosing LN Risk & Information Group trade secrets and confidential information, as

Dockets.Justia.com

well as damages for Colangelo's breaches of duties and related equitable relief on the grounds set forth herein.

## THE PARTIES

2.     LN Risk is a Minnesota corporation, headquartered in Boca Raton, Florida, with its principal place of business in Boca Raton, Florida. James Peck serves as President and Chief Executive Officer of LN Risk and is located in Boca Raton, Florida.

3.     Seisint is a Florida corporation, headquartered in Boca Raton, Florida, with its principal place of business in Boca Raton, Florida. James Peck (President and CEO of LN Risk) also serves as President and Chief Executive Officer of Seisint and is located in Boca Raton, Florida.

4.     LexisNexis is a division of Reed Elsevier Inc., a Massachusetts corporation with its principal place of business in New York. LexisNexis has its principal place of business in Dayton, Ohio. LexisNexis is a leading provider of information and services solutions, including its *Lexis* and *Nexis* research services, to a wide range of professionals in the legal, risk management, corporate, government, law enforcement, accounting and academic markets throughout the United States and the rest of the world.

5.     LexisNexis acquired Seisint in 2004. Seisint provides public record solutions to the US risk management industry, including federal, state and local government bodies and law enforcement agencies. Seisint's main product, Accurint, provides online access and analysis of public records and related information, principally serving the collections, federal, state and local law enforcement and legal segments. Seisint has developed leading data technologies for acquiring, processing, linking and

2

querying large datasets which deliver both product and cost leadership in its markets. Seisint's technology allows customers to compile, retrieve and analyze data quickly, accurately and cost-effectively.

6.      LN Risk, Seisint, and LexisNexis are commonly owned affiliated entities that together form LN Risk & Information Group.  LN Risk & Information Group is a provider and custodian of quality information and leverages new, cutting-edge technology, unique data and advanced scoring analytics to create advanced decision-making efficiencies at the point of need.  LN Risk & Information Group provides products and services specifically designed to serve the risk information industry, including federal, state and local government agencies, law enforcement agencies and professionals, financial services firms, collection agencies, insurance and health care providers, and others.  Customers include most federal government agency, state and local government agencies, and others.

7.      Colangelo is a resident of Virginia.  Beginning on September 11, 2000 and continuing until his resignation from LN Risk & Information Group on May 23, 2007, Colangelo worked in the LN Risk & Information Group as an employee of LexisNexis serving the LN Risk & Information Group's federal, state and local government solutions business over the 2000-2007 period in critical marketing and sales positions.  In his most recent position as Vice President of Sales for the LN Risk and Information Group, Colangelo was responsible for leading the LN Risk & Information Group sales effort with respect to federal, state and local government agencies.  Colangelo is now President and CEO of LocatePlus.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) on the grounds that the amount in controversy exceeds $75,000, and the parties are citizens of different states.

9.    Venue is proper in the Southern District of Florida under 28 U.S.C. §1391(a)(2) because a substantial part of the events giving rise to these claims occurred in the Southern District of Florida.  LN Risk and Seisint are both headquartered in the Southern District, Colangelo regularly worked with other LN Risk and Seisint business leaders and planned and executed sales and marketing activities for LN Risk & Information Group products and services in the Southern District.  In the course of these activities, Colangelo obtained access in the Southern District to LN Risk & Information Group trade secrets and confidential information.  Moreover, a substantial part of the property that is the subject of this action is situated in the Southern District, and the injury to the LN Risk & Information Group has occurred, accrued and continues to accrue, in part, in the Southern District.

10.    This Court has personal jurisdiction over Colangelo under Florida's long-arm statute, § 48.194, Florida Statutes (1987) because Colangelo transacted business in the State of Florida, because Colangelo is regularly and substantially engaged in activity within the State of Florida, and because acts of Colangelo have injured LN Risk and Seisint in the State of Florida.

4

## FACTS

### LN Risk & Information Group's Business

11.    The LN Risk & Information Group is an innovator in validating and verifying identity.  LN Risk & Information Group products and services help customers uncover fraudulent transactions, prevent identity theft, find missing children, track down terrorists, prosecute white collar criminals, support debt collection activities, and make intelligent hiring decisions.  LN Risk & Information Group products and services are specifically designed for markets such as collections, financial services, insurance, state and local governments (including law enforcement), human resources, and the Federal government.  Colangelo spent his entire tenure with LexisNexis working in the LN Risk & Information Group, primarily in the state, local and federal government business, but also in the LN Risk & Information Group non-governmental business.

12.    The LN Risk & Information Group offers background screening products and services for federal, state and local government organizations and non-governmental businesses that require screening and identification of individuals, including data integration and personalized account management.  LN Risk & Information Group offers the government agency or business customer a variety of search and screening options for the organization's background screening needs and requirements, such as criminal record checks, identity checks, fingerprint checks, drivers license checks, sexual predator records, and other searches and applications.

### Colangelo's Employment with LexisNexis

13.    In an August 30, 2000 letter, LexisNexis offered Colangelo the position of LexisNexis Marketing Manager.  See Letter of August 30, 2000 (Exhibit 1).  He was

expressly advised in this letter that the offer was contingent on him executing a non-compete and non-disclosure agreement. *Id.*

14.    From September, 2000 through April, 2002, Colangelo served as LexisNexis Federal Marketing Manager and was involved in LN Risk & Information Group strategic and tactical marketing initiatives with respect to LexisNexis sales to federal government agencies.

15.    On or about March 1, 2002, Colangelo received a promotion to Director of Business Development for the LexisNexis Federal Risk Management team and Online Solutions Group, which focused on LN Risk & Information Group sales to federal, state and local government agencies.

16.    On or about May 1, 2004 he was promoted to Senior Director of Market Planning, again focusing on sales to federal, state and local government agencies.

17.    On or about December 1, 2005, the LN Risk & Information Group promoted Colangelo to Vice President of Sales for LexisNexis Advanced Government Solutions, leading the LN Risk and Information Group sales effort with respect to various federal, state and local government agencies, including the Federal Bureau of Investigation and the Florida Department of Law Enforcement.  In his market planning and sales roles, Mr. Colangelo managed a number of sales professionals, who were located in Boca Raton, Florida and at other locations, and strategic accounts for customers located in Florida, among other places.

18.    In this executive-level position, Colangelo was the leader of the LN Risk & Information Group's federal, state, and local government sales effort and was privy to confidential information concerning sales, marketing, customer contacts, product

development, and strategic and tactical plans. Either in person or by teleconference, Colangelo regularly attended LN Risk & Information Group planning and staff meetings where high level business strategies, competitive strategies, product development, sensitive business and financial issues, customer opportunities, mergers and acquisitions, and other confidential matters were discussed. As Vice President of Sales of the Government Solutions branch of LN Risk & Information Group, Colangelo had even greater access to its business strategies, finances, customer contracts and information, and other confidential information and trade secrets.

19.     Colangelo was deeply involved in LN Risk & Information Group product development. He was close to LN Risk & Information Group customers and communicated his insights as to customer needs to product development personnel and programmers in Boca Raton, Florida and Dayton, Ohio. His experience in the law enforcement market over the past seven years with LexisNexis' customers gave him insights as to the product features that customers wanted in the rapidly-evolving field. When he became Vice President of Sales, Colangelo was responsible for product development in his assigned markets and oversaw employees engaged in product planning.

20.     Colangelo learned and became an expert in this expanding market and customer base through his work with LN Risk & Information Group, its customers and its resources.

21.     For example, when Colangelo first became a Marketing Manager with LexisNexis, he developed strategic market plans for the LN Risk & Information Group for sales to the market and for the products and features LN Risk & Information Group

needed to develop to satisfy market demands. The events of September 11, 2001 alerted law enforcement, federal, state and local government, and businesses generally to the need for greater security, better information and identification systems. As a consequence, the market for LN Risk & Information Group products and for those of their competitors grew dramatically. Colangelo was at the heart of the LN Risk & Information Group strategic planning during this time and became an expert in this area.

22.    Colangelo was involved in the strategic planning, evaluation and implementation of LN Risk & Information Group mergers and acquisitions. For example, Colangelo was deeply involved in the planning, execution and implementation of LexisNexis' acquisition of Seisint in 2004. Colangelo has been involved in multiple potential acquisitions that LN Risk & Information Group has considered over the years and currently. Colangelo knew LN Risk & Information Group's pricing and pricing strategies, profit margins, and cost structure.

23.    During his employment with LN Risk & Information Group, Colangelo was actively involved in sales and marketing efforts in direct competition with LocatePlus, a business which also provides actionable intelligence solutions to federal, state, and local governments, law enforcement agencies, collections agencies, and others.

### Colangelo's Contractual Obligations to LexisNexis

24.    Because of the nature of Colangelo's position as Federal Marketing Manager, where Colangelo would have access to sensitive LexisNexis business strategies, products, pricing points, and customer relationships and receive important training and resources from LexisNexis with which to develop government customer

8

contacts and relationships, LexisNexis conditioned his employment offer on agreeing to certain restrictive covenants.

25.    On August 31, 2000, before staring work with LexisNexis, Colangelo signed the LexisNexis Non-Compete/Non-Disclosure/Non-Solicitation Agreement ("LexisNexis Agreement"). (Exhibit 2)

26.    In his LexisNexis Agreement, Colangelo expressly promised:

> 1.    CONFIDENTIAL INFORMATION AND TRADE SECRETS
>
> 1.1.    I acknowledge that the business of LEXIS-NEXIS involves valuable, confidential and proprietary data, information and trade secrets of various kinds that I will have access to during my employment with LEXIS-NEXIS, which is called "LEXIS-NEXIS Confidential Information" and is defined below:
>
> 1.2.    "LEXIS-NEXIS Confidential Information" means any information, data, or other materials of LEIXS-NEXIS or of any individual or entity in the possession of LEXIS-NEXIS that is (i) proprietary or confidential to LEXIS-NEXIS or designated as LEXIS-NEXIS Confidential information by LEXIS-NEXIS, (ii) not generally known by non-LEXIS-NEXIS personnel, and (iii) acquired by, disclosed to or known by me as a result of or through my relationship with LEXIS-NEXIS (including information conceived, originated, discovered or developed in whole or in part by me), LEXIS-NEXIS Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing):
>
> 1.2.1.    any and all information relating to or otherwise concerning LEXIS-NEXIS's customers and prospective customers, suppliers and licensors including, the identifies thereof, the nature of LEXIS-NEXIS's relationships with its customers, suppliers and licensors, the business information of LEXIS-NEXIS's customers and prospective customers and potential customers and the types and amount of products acquired by customers from LEXIS-NEXIS.

1.2.2 sales, marketing and product development plans, marketing techniques, price lists, pricing policies, market forecasts and sales volume;

1.2.3 LEXIS-NEXIS's various proprietary computer systems (including software) and proprietary rights therein including, without limitation, proprietary computer and related equipment, computer programs (whether identified as software, firmware or other and on whatever media), object code, source code, documentation, manuals, data, proprietary hardware and software support systems, and methods, techniques and algorithms or organizing or applying the same;

1.2.4 developments, improvements, inventions, ideas, processes, procedures, discoveries, concepts, designs, drawings, specifications, molds, data, and "know-how".

1.2.5 financial information, including without limitation, sales and revenue information and financial statements;

1.2.6 product or service information, including, without limitation, product and data file designs and specifications, product development plans, product strategy and product delivery systems;

1.2.7 any information, not generally known, concerning LEXIS-NEXIS or its operations, products, personnel, finances, business relationships with third parties or businesses, which, if used or disclosed, could adversely affect the business of LEXIS-NEXIS, or give a competitor an advantage over those without access to such information, and

1.2.8 any information described above which LEXIS-NEXIS obtained or obtains from any individual or entity and which such individual or entity treats as proprietary or which is designed as LEXIS-NEXIS Confidential Information or which is designed with a legend indicating that it is confidential or proprietary, whether or not owned or developed by LEXIS-NEXIS.

INFORMATION PUBLICLY KNOWN THAT IS GENERALLY EMPLOYED IN THE INDUSTRY AT OR AFTER THE TIME I FIRST LEARN OF SUCH INFORMATION, OR GENERIC INFORMATION OR KNOWLEDGE WHICH I WOULD HAVE LEARNED IN

THE COURSE OF SIMILAR EMPLOYMENT OR
WORK ELSEWHERE IN THE TRADE, SHALL NOT BE
DEEMED        LEXIS-NEXIS        CONFIDENTIAL
INFORMATION.

1.3    During and after my employment with LEXIS-
NEXIS, and except to the extent required during the course
of my employment with LEXIS-NEXIS, I will hold in strict
confidence all LEXIS-NEXIS Confidential Information and
I will not use, either directly or indirectly, LEXIS-NEXIS
Confidential Information for any purpose, and specifically
without limiting the generality of the foregoing, I will not:

1.3.1. reveal, report, publish, disclose or transfer any
portion of LEXIS-NEXIS Confidential Information to any
person or entity;

1.3.2. assist any person or entity other than LEXIS-
NEXIS to secure any benefit from any LEXIS-NEXIS
Confidential Information;

1.3.3. utilize any LEXIS-NEXIS Confidential Information
in connection with soliciting business from or providing
services or products of any type to any of LEXIS-NEXIS's
customers or prospective customers;

1.3.4. perform services, whether as a principal, partner,
employee, director, consultant, or independent contractor,
for or on behalf of any person or entity in which the use,
disclosure or transfer of LEXIS-NEXIS Confidential
Information is likely to occur unless I can establish by clear
and convincing evidence that the use, disclosure or transfer
of LEXIS-NEXIS Confidential information is not likely to
occur.

2.    NON-SOLICITATION

Because of and in consideration of (i) the extensive
knowledge of LEXIS-NEXIS Confidential Information
provided to and possessed by me, including LEXIS-
NEXIS's customer, distributor, licensor and/or supplier
lists, (ii) the personal relationships and good will fostered
and intended to be fostered between me (on behalf of
LEXIS-NEXIS) and LEXIS-NEXIS's customers, licensees,
licensors, employees, distributors and/or suppliers with
whom I have or will have contact, (iii) the time and
expense incurred by LEXIS-NEXIS in training me and

11

supporting my job performance, and (iv) the highly competitive nature of LEXIS-NEXIS's business, I will not, during the period I am employed by LEXIS-NEXIS or at any time during the period of twenty-four (24) months immediately following the termination of my employment with LEXIS-NEXIS (for any reason or for no reason whatsoever), either directly or indirectly, solicit or attempt to solicit, interfere with, entice away from LEXIS-NEXIS or adversely affect LEXIS-NEXIS's relationship with any customer, licensee, licensor, distributor, source of supply or employee of LEXIS-NEXIS (whether actual or prospective). In addition, I will not, during the twenty-four (24) month period described above, authorize or knowingly condone or assist any individual or entity in taking any actions that I am prohibited from taking described above.

3.      NON-COMPETITION

3.1     Because of and in consideration of my employment and the items described in Paragraph 2(i)-(iv) above, during my employment with LEXIS-NEXIS and for a period of one (1) year immediately following the termination of my employment with LEXIS-NEXIS (for any reason or for no reason whatsoever) I will not in the Territory (defined below):

3.1.1.  own, manage, operate, join, control or participate in the ownership, management, operation or control of, or furnish any capital to or be connected in any manner (whether alone or as a partner, officer, director, employee, agent or shareholder) with, or provide any advice or services as a consultant for, any enterprise (including, without limitation any corporation, partnership, proprietorship, or other venture) which competes with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS;

3.1.2.  Become an agent or employee of any enterprise (including corporations, partnerships, proprietorships or other ventures) which competes with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS.

3.2.    I understand that nothing contained in this Agreement shall be deemed to prevent me from (i) purchasing or owning, directly or beneficially, as a passive investment, less than five percent (5%) of any class of the

publicly traded securities of any corporation, or (ii) accepting employment with a competing enterprise whose business is diversified and where the part of its business in which I am to become employed does not compete with LEXIS-NEXIS's business, so long as LEXIS-NEXIS, prior to me accepting such employment, receives separate written assurances satisfactory to LEXIS-NEXIS, in the sole exercise of its discretion, from the competing enterprise and me that I will not render services in an area competitive with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS.

3.3    The term "Territory" means any of the following to the extent applicable:

3.3.1. a zone inside of a 100 mile radius of each of the counties or parishes in which my customer accounts are located or in which I performed services on behalf of LEXIS-NEXIS, directly or indirectly (whether for compensation or otherwise); or

3.3.2. a zone inside of a 100 mile radius of each of the counties or parishes in which LEXIS-NEXIS has offices or customers; or

3.3.3. any state of the United States and the District of Columbia (including all territories, possessions and protectorates) in which LEXIS-NEXIS does business or has customers, distributor, suppliers or licensors; or

3.3.4. any foreign country in which LEXIS-NEXIS does business, either directly or through agents or distributors, or has customers, distributors, suppliers or licensors.

27.    Colangelo further expressly agreed that his LexisNexis Agreement would be governed and construed in accordance with the laws of the State of Ohio. *Id.*

**LocatePlus Employs Colangelo as its President, CEO, and Board Member**

28.    Colangelo resigned his employment on or about May 23, 2007, refusing to advise LexisNexis that he had accepted a position as President, Chief Executive Officer, and member of the Board of Directors of LocatePlus, a direct competitor of LN Risk & Information Group. LN Risk & Information Group first learned that Colangelo had

13

become President, Chief Executive Officer, and member of the Board of Directors of its competitor only as a result of a public filing by LocatePlus with the U.S. Securities and Exchange Commission ("SEC"). (Exhibit 3)  In fact, Colangelo made statements to his superiors, contemporaries and employees that he was moving to largely commercial (as opposed to government) business.

29.    LocatePlus' public filing with the SEC emphasizes Colangelo's service with LN Risk & Information Group and reveals confidential business information and trade secrets of LN Risk & Information Group concerning revenue levels and growth rates of the LN Risk & Information Advanced Government Solutions business.

### LocatePlus' Competition

30.    Upon information and belief, Colangelo provided a copy of the LexisNexis Agreement to LocatePlus before they began employing him.  Also upon information and belief, LocatePlus asked Colangelo to agree that his employment would be contingent on getting an exception from the LexisNexis Agreement because LocatePlus recognized that it and LN Risk & Information Group are competitors, and that Colangelo's employment with LocatePlus would breach the Agreement.    Upon information and belief, Colangelo refused such a condition, and LocatePlus agreed to employ Colangelo despite the LexisNexis Agreement.

31.    LocatePlus, along with its wholly-owned subsidiaries LocatePlus Corporation, Worldwide Information, Certifion Corporation, Dataphant Inc. and Metrigenics Inc., competes directly with LN Risk & Information Group in selling public information products and services, via LocatePlus' data integration solutions and systems, to federal, state, and local governments, businesses and other consumers.

32.    Like LN Risk & Information Group, LocatePlus and its wholly-owned subsidiaries provide comprehensive information and business solutions to federal, state, and local governments as well as businesses throughout the United States. LocatePlus claims to be the "industry leader in providing online investigative solutions to law enforcement, legal and insurance professionals, investigators, and other related businesses."

33.    Among other things, LocatePlus' products offer databases of non-public and public information which entities such as law enforcement organizations and other government agencies use to locate individuals, verify identifications, and perform background checks. According to LocatePlus, its products particularly serve government agencies with homeland security, anti-terrorism, and/or crime fighting responsibilities.

34.    For example, LocatePlus' on-line "look-out" and search products compete directly with LN Risk & Information Group products, including Seisint's Accurint products and LN Risk's on-line "look-out" and search products.

35.    As another example, LocatePlus also competes directly with LN Risk & Information Group in providing "batch services" to customers. "Batch services" are high-volume data transactions in which bulk data is sent by a customer to the batch service provider (which could be LocatePlus or LN Risk & Information Group). The batch service provider (LocatePlus or LN Risk & Information Group) sorts and/or supplements the customer's data with additional LexisNexis open source data, and then sends back the sorted/supplemented data to the customer. For example, a customer may send the service provider bulk electronic data consisting of names of individuals, addresses and phone numbers, (or just the names) and the service provider supplements

the customer's data with correct or updated addresses and/or phone numbers. "Batches" provide vital information to law enforcement, government agencies, and commercial companies, for whose business both LocatePlus and LN Risk & Information Group compete.

36.    As a competitor of LN Risk & Information Group in the federal, state and local government information services market, LocatePlus would greatly benefit from the LN Risk & Information's (1) sales and marketing information, plans and strategies, (2) federal, state and local government contacts and customers as well as their specific needs and price considerations, and (3) confidential information and trade secrets that Colangelo possessed as a result of his employment in important sales and marketing positions with LN Risk & Information Group from 2000 through 2007.

37.    In LocatePlus' filing with the SEC on May 30, 2007, LocatePlus specifically touted Colangelo's prior employment and positions with LN Risk & Information Group and wrongfully disclosed confidential information and trade secrets of LN Risk & Information Group concerning federal, state and local government sales revenue of LN Risk & Information Group:

> Colangelo was an employee of LexisNexis Corporation from September, 2000 to the present. From March, 2004 to the present he served as Vice President of Advanced Government Solutions, responsible for **[confidential LN Risk & Information Group information deleted]** per year in revenue. He achieved **[confidential LN Risk & Information Group information deleted]** growth in government sales in 2005 and 2006. Earlier, as Director of Industry Affairs, from April, 2002 through March, 2004 he had led a team of individuals which provided direction to the Federal Risk Management team and Online Solutions Group, focusing on federal, state and local government agencies. From September, 2000 through April, 2002, he

acted as Federal Marketing Manager, providing oversight
of all strategic and tactical marketing initiatives.

38.     On information and belief, Colangelo intentionally and wrongfully
disclosed the confidential information and trade secrets of LN Risk & Information Group
concerning its federal, state and local government sales revenue to LocatePlus as an
incentive to LocatePlus to employ Colangelo as its President, Chief Executive Officer,
and Board member. In addition, Colangelo intentionally and wrongfully made LN Risk
& Information Group's confidential information and trade secrets public in the May 30,
2007 SEC filing.

39.     On information and belief, Colangelo has disclosed other LN Risk &
Information Group trade secrets and confidential information to LocatePlus and its
subsidiaries, and executives, directors, shareholders, and employees of LocatePlus and its
subsidiaries.

40.     Colangelo personally capitalized on his breach of duty to LN Risk &
Information Group by disclosing LN Risk & Information Group's trade secrets and
confidential information in order to obtain his new position with LocatePlus, along with
his compensation and signing bonus.

41.     As LocatePlus' Director, President, and CEO, Colangelo will compete
directly with LN Risk & Information Group and, in particular, with his former position of
Vice President of Sales for federal, state, and local government products and services.

## COUNT I
## BREACH OF CONTRACT

42.     LexisNexis incorporates by reference the allegations contained in
Paragraphs 1 through 41 as if fully set forth herein.

17

43.    Colangelo, by engaging in and continuing to engage in the conduct and activities described herein, has violated and will continue to violate intentionally, materially and directly, the provisions of the LexisNexis Agreement, including the confidentiality, non-solicitation, and non-competition provisions.

44.    As a direct and proximate result of each of the wrongful actions described herein, LexisNexis has suffered, and will continue to suffer, irreparable harm and severe damage to its business, including loss of profits, loss of goodwill, loss of client relationships, and diminution of its competitive position in the marketplace, as well as other damages that cannot be qualified.

45.    LexisNexis is entitled to injunctive relief under the LexisNexis Agreement and under Florida and Ohio common law and to compensatory damages for the monetary harm caused by the above-described actions.

## COUNT II
## VIOLATION OF THE FLORIDA TRADE SECRETS ACT

46.    LN Risk & Information Group incorporates and realleges the allegations of paragraphs 1 - 45 of this Complaint as if fully set forth herein.

47.    This is an action brought for misappropriation of trade secrets under Fla. Stat. § 688.003 et. seq., the Florida Trade Secrets Act.

48.    LN Risk & Information Group afforded Colangelo broad access to trade secret information that derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable by proper means by, other competitors who could obtain economic value from the disclosure or use of such information, and which information was the subject of reasonable efforts under the circumstances to maintain its secrecy.

18

49.    Colangelo threatens to misappropriate or has misappropriated trade secrets of LN Risk & Information Group by the improper use or disclosure of such trade secrets on behalf of LocatePlus under circumstances giving rise to a duty to maintain the secrecy or limit the use of such trade secrets.

50.    Colangelo, by engaging in and continuing to engage in the conduct and activities described herein, has disclosed, and threatens to further disclose, LN Risk & Information Group's confidential and trade secret information.

51.    LN Risk & Information Group will suffer or has suffered irreparable injury for which there exists no adequate remedy at law for such misappropriations by either or both of Colangelo and LocatePlus, and for which LN Risk & Information Group respectfully requests injunctive relief pursuant to Fla. Stat. § 688.003 (1).

52.    LN Risk & Information Group further requests an award of such monetary damages that it proves at trial proximately resulted from the wrongful acts of Colangelo and LocatePlus as described herein, the exact extent of which is uncertain at this time but which damages continue in nature.

53.    LN Risk & Information Group has retained the undersigned counsel to represent it in this action and has agreed to pay the firm a reasonable fee for services rendered in prosecution of this matter which is subject to reimbursement by either or both Colangelo and LocatePlus pursuant to Fla. Stat. § 688.003.

### PRAYER FOR RELIEF

WHEREFORE, LN Risk & Information Group requests the following:

A.    Issuance of an injunction that permanently enjoins Colangelo from violating his LexisNexis Agreement, and from the use and disclosure of LN Risk &

Information Group's trade secrets and confidential information,

B.    Issuance of an injunction that enjoins Colangelo from being employed by LocatePlus Holdings Corporation or its affiliated companies;

C.    Issuance of an injunction that permanently enjoins Colangelo from improperly and illegally harming LN Risk & Information Group;

D.    Issuance of an injunction that requires Colangelo to return to LN Risk & Information Group all copies in whatever form, of any confidential and proprietary information of LN Risk & Information Group including, but not limited to, any information Colangelo wrote, copied, printed, or downloaded onto CD-ROMs, floppy disks, or any other computer media before he left LN Risk & Information Group, or which he in any way re-created after his departure from LN Risk & Information Group;

E.    Issuance of an award of compensatory damages in an amount to be determined by discovery;

F.    An award of punitive damages;

G.    Attorneys' fees and costs;

H.    Interest; and

I.    Any other relief the Court deems appropriate.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury of all issues so triable as of right by a jury.

Respectfully submitted,

By: _____

Scott S. Cairns
Florida Bar No.: 0037729
McGuireWoods LLP
50 N. Laura Street, Suite 3300
Jacksonville, FL 32202
(904) 798-3223 (Tel)
(904) 798-3261 (Fax)
scairns@mcguirewoods.com

Attorneys for Plaintiffs

## **VERIFICATION**

Personally appeared, before the undersigned attesting officer, _Martha Laurie David_, who, being duly sworn, states under oath that she is authorized to give this affidavit and that she serves as _VP of Human Resource_ for Plaintiff _Seisint, Inc._ and that no one person employed by Plaintiffs has knowledge of all the matters contained within Plaintiffs' Complaint and that the matters set forth herein are known to her to be true and correct or reported to her to be true and correct based on personal knowledge.

This _6th_ day of June, 2007.

_Martha Laurie David_

STATE OF _Florida_
COUNTY OF _Palm Beach_

The foregoing instrument was acknowledged before me this _6th_ day of _June_, 2007, by _Martha Laurie David_ Such person did take an oath and: (*notary must check applicable box*)

_____ is personally known to me.
___✓___ produced a current _FL_ driver's license as identification.
_____ produced _____ as identification.

(Affix seal)



Signature of Notary
Please Print: _ODALIZ MARTINEZ_
Commission Number: _DD650908_
My Commission expires: _March 14, 2011_

ODALIZ MARTINEZ
MY COMMISSION # DD650908
EXPIRES: March 14, 2011
Fl. Notary Discount Assoc. Co.

# Exhibit 1

9443 Springboro Pike
P O Box 933
Dayton, OH 45401

 LEXIS·NEXIS

August 30, 2000

Paul Colangelo
15590 Northgate Drive
Montclair, VA  22026

Dear Paul:

Let me be among the first to welcome you to the position of **Marketing Manager** on the  LEXIS-NEXIS team!  The details of our offer of employment are outlined below.

| | |
|---|---|
| Position: | **Marketing Manager** |
| Starting monthly salary: | **$ 7916.67** |
| Start date: | September 18, 2000 |
| Performance Incentive: | You will have the opportunity to earn an additional $10,000 via performance-based bonuses. Objectives will be established during your first month of employment. |

Your offer also includes participation in the Company's benefit program, which allows you to design your benefit package to fit your needs.  You may choose from a full range of benefit options including medical, dental, vision, employee and dependent life insurance, and long-term disability coverage. Additional benefits are available through our Salary Investment Plan (401(k)) and retirement plan. Details on the benefits program, including vacation and holiday schedules, are provided in the enclosed Employee Benefits Summary.

Your offer is contingent upon the following:
- Signing and returning the enclosed new hire forms by September 8, 2000.  Returning the completed paperwork by this date will ensure you receive your first paycheck for the first paycycle completed in your employment.

- Providing and completing a successful reference check

During your employment and thereafter, you must keep all company business matters confidential as outlined in the enclosed Non-Compete/Non-Solicitation Agreement.  This agreement must be signed and returned prior to your employment.

On your first day of employment, you must bring the enclosed I-9 form with you along with two (2) forms of identification from the "List of Acceptable Documents" on the back of the I-9 form. This form must be completed in the presence of your immediate manager or designee. If it is not possible to meet with your manager or his/her designee on your first day of employment, please contact Manpower Temporary Services collect at 937-435-3768. Andrea Snow or Heather Speer-Edwards will direct you to a Manpower office near you for completion of the form.

Please re-confirm your acceptance of this offer by signing and dating one copy of this letter and returning it along with your completed paperwork, in the enclosed, self-addressed envelope by September 8, 2000. Although this offer is made in good faith, it should not be interpreted as a contract between you and the Company. Acceptance of this offer indicates that you understand your employment is not guaranteed for any specific length of time and the Company or you may terminate your employment at any time for any reason. Also, please understand that no management official is authorized to make any assurance or promise of continued employment.

We look forward to you joining the LEXIS-NEXIS team. We're sure your skills and experience will play an important role in our continued success. In turn, we hope to offer you many opportunities to achieve your professional goals. If you have any questions, please contact me at 301-951-4526.

Sincerely,

Mark Bernatz (KR)

Mark Bernatz, PHR
Senior Human Resources Generalist

Enclosures

_____          _8/31/06_____
Acceptance Signature                      Date

# Exhibit 2

## LEXIS-NEXIS
## NON-COMPETE/NON-DISCLOSURE/NON-SOLICITATION AGREEMENT
### (Not for use in California)

In consideration of (i) my original employment or continued employment by LEXIS-NEXIS, a division of Reed Elsevier Inc., including any of its subsidiaries or affiliated companies, and any of its or their successors or assigns. (hereinafter collectively referred to as 'LEXIS-NEXIS'), and (ii) the compensation paid me during my employment by LEXIS-NEXIS, I, the undersigned, agree as follows:

**1.    CONFIDENTIAL INFORMATION AND TRADE SECRETS**

1.1      I acknowledge that the business of LEXIS-NEXIS involves valuable, confidential and proprietary data, information and trade secrets of various kinds that I will have access to during my employment with LEXIS-NEXIS, which is called "LEXIS-NEXIS Confidential Information" and is defined below.

1.2      'LEXIS-NEXIS Confidential Information' means any information, data or other materials of LEXIS-NEXIS of any individual or entity in the possession of LEXIS-NEXIS that is (i) proprietary or confidential to LEXIS-NEXIS or designated as LEXIS-NEXIS Confidential Information by LEXIS-NEXIS; (ii) not generally known by non-LEXIS-NEXIS personnel, and (iii) acquired by disclosed to or known by me as a result of or through my relationship with LEXIS-NEXIS (including information conceived, originated, discovered or developed in whole or in part by me). LEXIS-NEXIS Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing):

    1.2.1      any and all information relating to or otherwise concerning LEXIS-NEXIS's customers and prospective customers, suppliers and licensors including, the identities thereof, the nature of LEXIS-NEXIS's relationships with its customers, suppliers and licensors, the business information of LEXIS-NEXIS's customers and prospective customers and potential customers and the types and amount of products acquired by customers from LEXIS-NEXIS;

    1.2.2      sales, marketing and product development plans, marketing techniques, price lists, pricing polices, market forecasts and sales volume;

    1.2.3      LEXIS-NEXIS's various proprietary computer systems (including software) and proprietary rights therein including, without limitation, proprietary computer and related equipment, computer programs (whether identified as software, firmware or other and on whatever media), object code, source code, documentation, manuals, data, proprietary hardware and software support systems, and methods, techniques and algorithms or organizing or applying the same;

    1.2.4      developments, improvements, inventions, ideas, processes, procedures, discoveries, concepts, designs, drawings, specifications, molds, data, and "know-how";

    1.2.5      financial information, including, without limitation, sales and revenue information and financial statements;

    1.2.6      product or service information, including, without limitation, product and data file designs and specifications, product development plans, product strategy and product delivery systems;

    1.2.7      any information, not generally known, concerning LEXIS-NEXIS or its operations, products, personnel, finances, business relationships with third parties or businesses, which, if used or disclosed, could adversely affect the business of LEXIS-NEXIS, or give a competitor an advantage over those without access to such information; and

    1.2.8      any information described above which LEXIS-NEXIS obtained or obtains from any individual or entity and which such individual or entity treats as proprietary or which is designated as LEXIS-NEXIS Confidential Information or which is designated with a legend indicating that it is confidential or proprietary, whether or not owned or developed by LEXIS-NEXIS.

INFORMATION PUBLICLY KNOWN THAT IS GENERALLY EMPLOYED IN THE INDUSTRY AT OR AFTER THE TIME I FIRST LEARN OF SUCH INFORMATION, OR GENERIC INFORMATION OR KNOWLEDGE WHICH I WOULD HAVE LEARNED IN THE COURSE OF SIMILAR EMPLOYMENT OR WORK ELSEWHERE IN THE TRADE, SHALL NOT BE DEEMED LEXIS-NEXIS CONFIDENTIAL INFORMATION.

1.3      During and after my employment with LEXIS-NEXIS, and except to the extent required during the course of my employment with LEXIS-NEXIS, I will hold in strict confidence all LEXIS-NEXIS Confidential Information and I will not use, either directly or indirectly, LEXIS-NEXIS Confidential Information for any purpose, and specifically without limiting the generality of the foregoing, I will not

    1.3.1      reveal, report, publish, disclose or transfer any portion of LEXIS-NEXIS Confidential Information to any person or entity;

    1.3.2      assist any person or entity other than LEXIS-NEXIS to secure any benefit from any LEXIS-NEXIS Confidential Information;

    1.3.3      utilize any LEXIS-NEXIS Confidential Information in connection with soliciting business from or providing services or products of any type to any of LEXIS-NEXIS's customers or prospective customers;

    1.3.4      perform services, whether as a principal, partner, employee, director, consultant, or independent contractor, for or on behalf of any person or entity in which the use, disclosure or transfer of LEXIS-NEXIS Confidential Information is likely to occur unless I can establish by clear and convincing evidence that the use, disclosure or transfer of LEXIS-NEXIS Confidential Information is not likely to occur.

**2.    NON-SOLICITATION**

Because of and in consideration of (i) the extensive knowledge of LEXIS-NEXIS Confidential Information provided to and possessed by me, including LEXIS-NEXIS's customer, distributor, licensor and/or supplier lists, (ii) the personal relationships and good will fostered and intended to be fostered between me (on behalf of LEXIS-NEXIS) and LEXIS-NEXIS's customers, licensees, licensors, employees, distributors and/or suppliers with whom I have or will have contact, (iii) the time and expense incurred by LEXIS-NEXIS in training me and supporting my job performance, and (iv) the highly competitive nature of LEXIS-NEXIS's business, I will not, during the period I am employed by LEXIS-NEXIS or at any time during the period of twenty-four (24) months immediately following the termination of my employment with LEXIS-NEXIS (for any reason or for no reason whatsoever), either directly or indirectly, solicit or attempt to solicit, interfere with, entice away from LEXIS-NEXIS or adversely affect LEXIS-NEXIS's relationship with any customer, licensee, licensor, distributor, source of supply or employee of LEXIS-NEXIS (whether actual or prospective). In addition, I will not, during the twenty-four (24) month period described above, authorize or knowingly condone or assist any individual or entity in taking any actions that I am prohibited from taking described above.

**3.    NON-COMPETITION**

3.1      Because of and in consideration of my employment and the items described in Paragraph 2(i)-(iv) above, during my employment with LEXIS-NEXIS and for a period of one (1) year immediately following the termination of my employment with LEXIS-NEXIS (for any reason or for no reason whatsoever) I will not in the Territory (defined below):

    3.1.1      own, manage, operate, join, control or participate in the ownership, management, operation or control of, or furnish any capital to or be connected in any manner (whether alone or as a partner, officer, director, employee, agent or shareholder) with, or provide any advice or services as a consultant for, any enterprise (including, without limitation any corporation, partnership, proprietorship or other venture) which competes with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS;

    3.1.2      become an agent or employee of any enterprise (including corporations, partnerships, proprietorships or other ventures) which competes with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS;

3.2      I understand that nothing contained in this Agreement shall be deemed to prevent me from (i) purchasing or owning, directly or beneficially, as a passive investment, less than five percent (5%) of any class of the publicly traded securities of any corporation, or (ii) accepting employment with a competing enterprise whose business is diversified and where the part of its business in which I am to become employed does not compete with LEXIS-NEXIS's business, so long as LEXIS-NEXIS, prior to me accepting such employment, receives separate written assurances satisfactory to LEXIS-NEXIS, in the sole exercise of its discretion, from the competing enterprise and me that I will not render services in an area competitive with LEXIS-NEXIS's business as conducted during the period of my employment with LEXIS-NEXIS.

3.3      The term "Territory" means any of the following to the extent applicable:

    3.3.1      a zone inside of a 100 mile radius of each of the counties or parishes in which my customer accounts are located or in which I performed services on behalf of LEXIS-NEXIS, directly or indirectly (whether for compensation or otherwise); or

    3.3.2      a zone inside of a 100 mile radius of each of the counties or parishes in which LEXIS-NEXIS has offices or customers; or

    3.3.3      any state of the United States and the District of Columbia (including all territories, possessions and protectorates) in which LEXIS-NEXIS does business or has customers, distributor, suppliers or licensors; or

    3.3.4      any foreign country in which LEXIS-NEXIS does business, either directly or through agents or distributors, or has customers, distributors, suppliers or licensors.

**4.    RELIEF**

Because, during my employment with LEXIS-NEXIS, I will gain unique expertise and experience in the field of LEXIS-NEXIS's business and the time and expense incurred by LEXIS-NEXIS in training me and supporting me. I acknowledge and agree that the services to be performed hereunder by me are of a special, unique, unusual, extraordinary or intellectual character which are of peculiar value, the loss of which cannot be reasonably or adequately compensated in damages. I also acknowledge and agree that LEXIS-NEXIS Confidential Information is unique, irreplaceable and valuable. Therefore, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to LEXIS-NEXIS for the breach by me of any of the provisions of Paragraphs 1, 2 and 3 hereof, and, accordingly, I acknowledge and agree that LEXIS-NEXIS shall be entitled to equitable remedies including, without limitation, specific performance and injunctive relief (preliminary or otherwise) to enforce the above-described provisions of this Agreement.

**5.    CONSTRUCTION**

This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the internal laws of the State of Ohio.

**6.    SEVERABILITY**

The restrictive covenants contained in this Agreement relating to LEXIS-NEXIS Confidential Information and my non-competition and non-solicitation obligations are independent of each other and each of the remaining provisions of this Agreement. If any provision of this Agreement shall be determined, under applicable law, to be unlawful, void, or, for any reason, unenforceable, such provision shall be narrowed and/or interpreted so as to operate only to the broadest extent permitted by applicable law, and any provisions which cannot be so limited or interpreted shall be deemed stricken from, and shall in no way affect the validity or enforceability of, the remaining provisions of this Agreement. Without limiting the foregoing, to the extent any provision of this Agreement shall be determined, under applicable law, to be overly broad in duration, geographical coverage or substantive scope, such provision shall be deemed narrowed to the broadest extent permitted by applicable law.

**7.    WAIVER**

A waiver by LEXIS-NEXIS of any provision of this Agreement or with respect to a similar agreement with any employee of LEXIS-NEXIS shall not operate or be understood as a waiver of any subsequent breach of the same provision of this Agreement by me. Waivers, if any, to be effectively asserted against LEXIS-NEXIS must be in writing and signed by an officer of LEXIS-NEXIS.

**8.    ENTIRE AGREEMENT AND AMENDMENT**

8.1    I acknowledge and agree that this Agreement represents the entire agreement and understanding between the parties hereto regarding my employment with LEXIS-NEXIS and supersedes any and all previous written or oral agreements or discussions between the parties and any other person or legal entity.

8.2    I further acknowledge and agree that nothing set forth in this Agreement or in any LEXIS-NEXIS guidelines, policies, rules, regulations or procedures relating to my employment with LEXIS-NEXIS, including those relating to any termination or grievance procedures, nor any course of conduct by LEXIS-NEXIS (nor any aspect thereof) in this regard, shall be construed to confer any right or expectation with respect to my original and continued employment by LEXIS-NEXIS, nor shall it interfere in any way with LEXIS-NEXIS's right to terminate my employment at any time, with or without cause, for any reason or for no reason at all.

8.3    This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing, signed by both of the parties hereto.

**9.    REPRESENTATIONS REGARDING PRIOR CONTRACTS**

I represent and warrant that I have not entered into any prior contract or agreement of any kind that will be violated or that will interfere in any manner with the complete performance of my duties in connection with my employment with LEXIS-NEXIS.

**10.    SUCCESSORS AND ASSIGNS**

I acknowledge and agree that the rights and obligations LEXIS-NEXIS and me under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties. Without limiting the foregoing, this Agreement and my rights and obligations hereunder shall remain in full force and effect in the event I am transferred to an "affiliate" of LEXIS-NEXIS, in which case all references herein to LEXIS-NEXIS shall be deemed references to such affiliated entity as well.

IN WITNESS WHEREOF, I have executed this Agreement as of the date written below.

_____        _____8/31/00_____
(Signature)                                (Date)

_____        _P_____
(Print Name)                               (City, County, State, Country)


**LEXIS-NEXIS COPY**

# Exhibit 3

8-K

**LOCATEPLUS HOLDINGS CORP filed this Form 8-K on 05/30/07**

<< Previous Page | Next Page >>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): May 14, 2007

LOCATEPLUS HOLDINGS CORPORATION
(Exact name of registrant as specified in its charter)

000-49957
(Commission File Number)

DELAWARE                                      04-3332304
(State or other jurisdiction of        (I.R.S. Employer
Identification No.)
       incorporation)

100 CUMMINGS PARK, SUITE 235M
BEVERLY, MA 01915
(Address of principal executive offices, with zip code)

(978) 921-2727
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is
intended to
simultaneously satisfy the filing obligation of the registrant under
any of the
following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the
Securities Act
       (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the
Exchange Act
       (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b)
under the
       Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c)
under the

Exchange Act   (17   CFR   240.13e-4(c))

ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

See Item 5.02 Below.

ITEM 5.02 DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF
DIRECTORS;
APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN
OFFICERS.

The  Company announced that the Board of Directors has elected Paul
Colangelo as a  Director  and  has  appointed him as President and
Chief Executive Officer to lead  it  through  the  next  stage  of
growth. James Fields, the interim Chief Executive  Officer,  will
continue  as the Acting Chief Financial Officer. The Board  has  also
accepted  the  resignation  of  Peter  Zekos.

Mr. Colangelo was an employee of LexisNexis Corporation from September,
2000 to the present.  From March, 2004 to the present he served as Vice
President of Advanced Government Solutions, responsible for     million
per year in revenue.  He achieved           . growth in government
sales in 2005 and 2006.  Earlier, as Director of Industry Affairs, from
April, 2002 through March, 2004 he had led a team of individuals which
provided direction to the Federal Risk Management team and Online
Solutions Group, focusing on federal, state and local government
agencies.

From September, 2000 through April, 2002, he acted as Federal Marketing
Manager,providing oversight of all strategic and tactical marketing
initiatives.  Prior to his service with LexisNexis he served as
Director of Marketing and Product Manager of ChoicePoint, Inc. from
August, 1997 through September, 2000 From June, 1995 through August,
1997 he acted as business development manager for government operations
of Robbins-Gioia, Inc., effectively performing all elements of
Marketing and Business Development; market research,  identification
of new business areas, facilitation of business engagements, corporate
presentations, and development of marketing brochures.

Mr. Colangelo has a B.A. in political science from PlaceNameSeton
PlaceTypeHall PlaceTypeUniversity (1994) and is completing his MBA in
Busines Administration from placePlaceNameStrayer PlaceTypeUniversity
(2007). He is a member of the Law Enforcement Committee for the
placePlaceNameNational PlaceTypeCenter for Missing and Exploited
Children.

Mr. Colangelo has a three year employment agreement at an annual base
salary of $250,000 with an annual 10% upward adjustment every January
1. He is to receive a signing bonus of $150,000 and will receive an
additional $100,000 payable in 10 equal monthly installments. The full
amount of this bonus is repayable by him if his employment terminates
prior to the end of 12 months. In addition, commencing
dateYear2008Day31Month12December 31, 2008 he will receive an annual
bonus equal to 8% of the net increase in revenues for the year.

SIGNATURES
Pursuant to the requirements of the Securities Exchange Act of
1934, the Registrant has duly caused this report to be signed
on its behalf by the undersigned hereunto duly authorized.

LOCATEPLUS HOLDINGS CORPORATION

By /s/ James C. Fields

James C. Fields
Acting Chief Financial Officer
Date: Mary 29, 2007

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
LexisNexis Risk and Information Analytics Group Inc., Reed Elsevier Inc., and Seisint, Inc.,

**DEFENDANTS**
Paul Colangelo

07-80486

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

JOHNSON

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Scott S. Cairns
McGuireWoods LLP
50 N. Laura Street, Suite 3300
Jacksonville, FL 32202
(904) 798-3223

Attorneys (If Known)

07CV 80486 Middlebrooks/JOHNSON

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☒ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

FILED by _____
JUN - 6 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - FT. PIERCE

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO
JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332(a) - Diversity, Breach of Contract, Trade Secrets
LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD _____
DATE 6/6/07

FOR OFFICE USE ONLY
AMOUNT $350.00    RECEIPT # 232449    IFP