UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

LEXISNEXIS RISK AND
INFORMATION ANALYTICS
GROUP INC., *et al.*

    Plaintiffs,

vs.                                             CASE NO.: 07-80486-CIV-MIDDLEBROOKS

PAUL COLANGELO,

    Defendants
_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER OR IN THE ALTERNATIVE
A PRELIMINARY INJUNCTION**

    Plaintiffs, LexisNexis Risk and Information Analytics Group Inc. ("LN Risk"), Seisint, Inc. ("Seisint"), and LexisNexis a division of Reed Elsevier Inc. ("LexisNexis") (collectively, the "LN Group"), by counsel, respectfully submit this Memorandum in Support of their Motion for a Temporary Restraining Order:

### I.    INTRODUCTION

    Since the LN Group filed its Verified Complaint for Injunctive Relief and Damages on June 6, 2007, it has learned through its computer forensics efforts that Defendant Paul Colangelo ("Colangelo") burned approximately 292 files containing extremely confidential LN Group information to a CD-ROM and attached an external hard drive to his computer in the days immediately preceding his resignation from LexisNexis to become the President, Chief Executive Officer, and a Member of the Board of Directors for LocatePlus Holdings Corporation ("LocatePlus"), a direct LN Group competitor. Recently recovered e-mails further establish that, at that same time and while still a LexisNexis employee, he was actively assisting LocatePlus' effort to obtain investor financing.

    Even more disturbing, Colangelo, through his counsel, admitted to the LN Group this week after entry of this Court's June 12, 2007 Order granting the LN Group's motion for expedited

1

discovery that he retained at least one jump drive or "memory stick" and one external hard drive containing LN Group information after he began working for LocatePlus. The LN Group's initial forensics examination of these two recently received devices reveal that both contain significant amounts of highly confidential and proprietary files that were either created, downloaded, or accessed by Colangelo in the days immediately preceding his resignation. The LN Group has reason to believe that Colangelo possesses at least one and maybe two other jump drives with LN Group information on them.

Given the ever-increasing amount of evidence demonstrating Colangelo's blatant misappropriation of the LN Group's confidential information and trade secrets and breach of his restrictive covenant, the LN Group will suffer irreparable harm if Colangelo is not enjoined from working for LocatePlus and from misappropriating the LN Group's confidential information and trade secrets. Accordingly, the LN Group respectfully moves this Court for temporary injunctive relief as detailed below and in the LN Group's motion for injunctive relief.

## II.    FACTS

### A.    Introduction of the Parties and Key Entities

LN Risk, together with Seisint, Inc. and LexisNexis, a division of Reed Elsevier Inc. (collectively the "LN Group"), provides a platform of risk management products and services to help customers in various industries, including federal, state, and local governments. See Verified Complaint ("VC") at ¶¶ 2-6. At the time of his resignation, Colangelo was Vice President – Advanced Government Solutions for LexisNexis. See VC at ¶ 7. In this high-level executive position, Colangelo was responsible for leading the sales effort with respect to federal, state and local government agencies. See id. Colangelo was also a member of the AGS Executive Team, a group of high level executives involved in strategy, financial and market planning, product development, revenue decisions, and others for the LN Group. See Declaration of John Casciano ("JC Decl.") at ¶ 3, attached hereto as Exhibit 1.

### B.    The Business of LN Risk—Advanced Governmental Solutions

The LN Group is an innovator in validating and verifying identity. VC ¶¶ 11. For federal, state, and local governments—the business for which Colangelo directed its sales—the LN Group offers Advanced Government Solutions which allow governmental customers, among other things: (a) to anticipate and detect security threats by pinpointing critical information contained within

massive volumes of data; (b) to effectively locate suspects, find missing children and solve cases by providing instant access to critical information that otherwise would require extensive amounts of time to gather; and (c) to secure and protect access to critical systems and facilities and mitigate problems associated with entitlements fraud. See Declaration of Mark Boulware ("MB Decl.") ¶ 4, attached hereto as Exhibit 2; VC ¶¶ 11-12.

LocatePlus competes directly with the LN Group in selling public information products and services to federal, state, and local governments, businesses and other consumers. See JC Decl. at ¶¶ 9, 14; MB Decl. at ¶¶ 5-6. Among other things, LocatePlus's products offer databases of non-public and public information which entities such as law enforcement organizations and other government agencies use to locate individuals, verify identifications, and perform background checks. See JC Decl. at ¶¶ 9, 14; MB Decl. at ¶¶ 5-6; VC at ¶¶ 31-33. Colangelo acknowledged LocatePlus' status as a competitor to his direct reports, and the LN Group's 2006 Risk Government Market Plan lists LocatePlus as of the LN Group's eight top competitors. See MB Decl. at ¶ 6; JC Decl. at ¶ 9.

### C. **Colangelo's Employment with the LexisNexis.**

LexisNexis hired Colangelo on September 11, 2000. Continuing until his May 23, 2007 resignation, Colangelo worked for LexisNexis serving LexisNexis's federal, state, and local government solutions business in critical marketing and sales positions. See VC at ¶ 7, 13-17.[1] At the inception of his employment, Colangelo executed a Non-Competition/Non-Disclosure/Non-Solicitation Agreement (the "Agreement"), on or about August 31, 2000. See VC at ¶¶ 25-26. The restrictions set forth in the Agreement restrain, inter alia., the use, dissemination or disclosure of "Confidential Information" (a defined term), and certain post-employment activities during a one-year period of time subsequent to the termination of his employment relationship with the Company. See VC ¶ 26 (setting forth Sections 1, 2 and 3 of the Agreement).

Most recently, Colangelo held the position of Vice President – Advanced Government Sales. See JC Decl. ¶ 3; MB Decl. at ¶ 3. As such, Colangelo was responsible for leading the LN Group's sales effort with respect to federal, state, and local government agencies. See JC Decl. ¶ 3; MB Decl. at ¶ 3. Additionally, Colangelo served as a member of the AGS Executive Team - a group of high

---

[1]. As the VP-AGS, Colangelo was provided with a company-issued laptop computer as well as a company-issued Blackberry device. Additionally, Colangelo was provided access to a secure server containing LN Risk's electronically stored information. See JC Decl. at ¶ 5.

3

level executives involved in strategy, financial and market planning, product development, revenue decisions, and others for the Company. See JC Decl. at ¶ 4. Colangelo was a key contributor to the Executive Team and was heavily involved in developing the business strategy for the LN Group until his resignation in May 2007. Id. at ¶ 6.

Colangelo, by virtue of his executive position with LexisNexis, had extensive access to the LN Group's confidential and proprietary information (which is generally access restricted by permissions related to user identification). See JC Decl. at ¶ 6. Among other things, he had access to the LN Group's business plans, market strategy information, customer lists, Siebel Funnel Review documents, Account Overview documents, periodic revenue reports, documents regarding potential merger and acquisition targets, product development efforts and other sensitive proprietary information. See id. As evidenced below, these are the very sort of documents Colangelo burned to CD-ROM on May 5, 2007, uploaded to the thumb drive and external hard drive he took with him when he resigned, and accessed on the thumb drive and external hard drive throughout May 2007.

### D. Colangelo Resigns Under False Pretenses

As early as March 15, 2007, Colangelo engaged in detailed discussions with LocatePlus about leaving LexisNexis and becoming a LocatePlus executive. Specifically, LocatePlus sent Colangelo a March 15, 2007 e-mail, with LocatePlus' Board of Directors copied, stating that things were moving slowly but "according to schedule." Declaration of Christopher Racich ("CR Decl.") at ¶ 10, attached hereto as Exhibit 3. Colangelo sent a reply e-mail stating that he would "await (sic) for the financing to review" and would forward LocatePlus a "copy of my non-compete" over the weekend. Id. Less than ten days after this e-mail exchange, LocatePlus announced that it has secured $6 million in new financing and that its President and CEO had resigned. See Form 8-K Report, attached hereto as Exhibit 4.

Colangelo resigned his employment on or about May 23, 2007. See VC ¶ 28. While still a LexisNexis executive and unbeknownst to the LN Group, Colangelo actively worked with LocatePlus' Board of Directors and others in an effort to help LocatePlus—the LN Group's direct competitor—in an effort to obtain sources of investor funding. See CR Decl. at ¶ 12. When Colangelo resigned, he refused to advise the LN Group that he had accepted a position as President, Chief Executive Officer, and member of the Board of Directors of LocatePlus. See VC at ¶ 28. In fact, Colangelo made misleading statements to his superiors, contemporaries, and employees that he

was moving to a "commercial business." See JC Decl. at ¶ 12; see also MB Decl. at ¶ 8 ("When I asked him where he was going to work, he first said 'I don't know,' and later said 'I can't tell you because I have an NDA,' which I understood to mean a non-disclosure agreement.").

The LN Group first learned that Colangelo had become President, Chief Executive Officer, and Member of the Board of Directors of its competitor only as a result of a public filing by LocatePlus with the U.S. Securities and Exchange Commission (the "SEC"). See VC, Ex. 3. As President and CEO, Colangelo will be involved in all aspects of LocatePlus' business, including, sales, marketing, product development, and overall business strategy such as possible merger and acquisition activities. JC Decl. at ¶ 14.

### E. Colangelo's Misappropriation and Inevitable Future Disclosure of LN Group Confidential Information and Trade Secrets

Upon learning of Colangelo's deceit, the LN Group conducted forensic research efforts on Colangelo's LexisNexis-issued computer to determine if Colangelo had absconded with confidential information and/or trade secrets. See CR Decl. at ¶ 6. These efforts revealed that Colangelo had burned approximately 292 files, including many sensitive, proprietary LN Group documents, from his computer to CD-ROM on Saturday, May 5, 2007. See CR Decl. at ¶ 11; JC Decl. at ¶¶ 7-10. For example, one of the documents titled "2006 Acquisition Candidates_V2_Govt" details companies that LN Group was evaluating, and continues to evaluate, as potential acquisitions. See JC Decl. at ¶ 8. Another document titled "2006_Risk_Government_Market_Plan_v11" specifies in great detail LN Risk's plans for matters such as product development, pricing, and competitive opportunities. JC Decl. at ¶ 9. In short, it provides a detailed roadmap for how the LN Group sought to go to market in 2006, describing marketing channel partners, actual and potential alliances, and pricing strategies. Id. Notably, it also provides a section titled "Overall Competitive Threat in the On-Line/Data" that includes LocatePlus as one of the LN Group's top eight competitors. Id. These documents are highly confidential and would be extremely damaging in the possession of a competitor such as LocatePlus. JC Decl. at ¶¶ 8-9.

After the LN Group filed this lawsuit and began uncovering evidence of Colangelo's misconduct, the LN Group learned that Colangelo continued to possess at least one thumb drive and one external hard drive on which he had downloaded confidential LN Group information. See CR Decl. at ¶¶ 13-17. Initial forensics research efforts on these devices conducted after Colangelo produced them following this Court's entry of its Order of June 12, 2007 revealed that Colangelo

apparently downloaded numerous LN Group files to the thumb drive and the hard drive in the days before his resignation and also accessed numerous LN Group files on these devices during that period. See CR Decl. at ¶¶ 13-17. Indeed, it appears that he attached the external hard drive to his LexisNexis computer on Sunday, May 20, 2007, just days before he resigned. CR Decl. ¶ 13. Also, a forensics examination of his computer revealed that at least two other thumb drives, which have not been produced, had been attached to his LexisNexis computer. See CR Decl. at ¶ 15.

Based on Colangelo's position with LocatePlus, his extensive knowledge of the LN Group's business, and the evidence of his transmission and removal of the LN Group's sensitive business information, he will inevitably disclose or use the LN Group's confidential and proprietary information and trade secrets if he is permitted to continue in LocatePlus' employ. JC Decl. at ¶¶ 14-15.

### III. ARGUMENT

The LN Group respectfully requests the entry of a Temporary Restraining Order or in the alternative a Preliminary Injunction, pursuant to Fed. Rule of Civil Procedure 65, to protect against any misappropriation or use of its valuable trade secrets, disclosure of its confidential and proprietary information, and/or subversion of the good will that it maintains with its customers through the violation of the Colangelo Agreement.

#### A. Standard for Obtaining a Temporary Restraining Order ("TRO").

The granting of a TRO requires the movant to establish four elements: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005). Each of these requirements is met here.

Colangelo's aforementioned conduct both before and after his resignation from LexisNexis constitutes a breach the Agreement and also constitutes a violation of Florida's Uniform Trade Secrets Act. The fact that Colangelo is the CEO and President of his former employer's direct competitor combined with the nature and quantity of documentation that was forensically misappropriated by Colangelo prior to his departure supports the conclusion that irreparable injury will result absent the issuance of the requested injunctive relief. No adequate remedy exists at law for the damages that are likely to result were Colangelo permitted to: (1) remain in LocatePlus'

employ; and/or (2) retain any of LN Group's confidential, proprietary and trade secret information. The immediate and substantial likelihood of irreparable harm to the LN Group substantially outweighs any harm that Colangelo will experience through the granting of a temporary restraining order or in the alternative a preliminary injunction. Finally, the public interest is best served by maintaining the integrity of state statutes and valid private agreements. In sum, this Court should grant the LN Group's Motion for Temporary Restraining Order or in the Alternative a Preliminary Injunction.

### B. The LN Group is likely to succeed on the merits of its claim for breach of the Agreement.

#### 1. The Agreement is Enforceable.

The Agreement provides that it is to be construed under the laws of the State of Ohio. VC, Ex. 2 at ¶ 5. Therefore, Ohio's law will determine whether Colangelo has breached the Agreement. Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000).

Like Florida, Ohio recognizes and enforces valid post-employment restrictive covenants, such as non-competition, non-solicitation, and non-disclosure agreements. Briggs v. Butler, 45 N.E.2d 757, 762-63 (Ohio App. 1942). To be valid and enforceable, a post-employment restrictive covenant must be reasonable, which under Ohio law means that it (1) does not restrict the former employee more than is necessary to protect the employer's valid interests; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. Raimonde v. Van Vlerah, 325 N.E.2d 544, 547 (Ohio 1975).

If a post-employment restrictive covenant imposes restrictions on a former employee greater than those necessary to protect the former employer's interests, then an Ohio court will nevertheless enforce it to the extent necessary to protect the employer's interests. Id. In so doing, a court is empowered to "modify or amend" (i.e., "blue-pencil") any such agreement. Id. Ohio considers the protection of a former employer's trade secrets and valuable confidential information as a presumptively valid interest. Nat'l Interstate Ins. Co. v. Perro, 934 F. Supp. 883, 890 (N.D. Ohio 1996); Levine v. Beckman, 548 N.E.2d 267, 271 (Ohio App. 1988). Additionally, Ohio courts hold that customer good will constitutes a legitimate interest worthy of protection by way of a restrictive covenant. Perro, 934 F. Supp. at 890.

Colangelo's Agreement with LexisNexis clearly references his access to confidential information, including trade secrets, as well as the good will fostered between him and customers of LexisNexis during his employment there. Ex. 2 ¶¶ 2, 3. The restrictions contained in the Agreement are drafted to protect against disclosure of such confidential information and destruction of such good will and customer relationships. Therefore, the Agreement is supported by interests deemed valid, legitimate, and worthy of protection under Ohio law. Perro, 934 F. Supp. at 890; Levine, 548 N.E.2d at 271.

The restrictions in the Agreement are no greater in scope than is necessary to protect the interests outlined above. The Agreement restricts Colangelo from working for a business in competition with the business of LexisNexis, its subsidiaries, and its affiliates, as such business was conducted while he was employed with LexisNexis. This scope of activity is reasonable in that it protects the ability of LexisNexis and its affiliates—specifically the LN Group—to secure and further develop their confidential information and trade secrets and to take action to maintain and further secure the good will of their existing customers without unfair interference from a competitor seeking to gain such information and relationships through LexisNexis's former employee's knowledge. Further, Colangelo is restricted from this activity for only one year. This time period has been held reasonable in multiple situations in Ohio. See, e.g., Avery Dennison Corp. v. Kitsonas, 118 F. Supp. 2d 848, 853-54 (S.D. Ohio 2000) (1-year restriction on regional sales manager); Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co., 714 N.E.2d 898, 901-02 (Ohio 1999) (1-year restriction on independent insurance agent). Finally, the restrictions on Colangelo's business activities are limited to certain geographical areas, as outlined below.

The Agreement states its geographical limitations in the alternative, depending on which limitation is applicable to a particular employee. See VC, Ex. 2 ¶ 3. The first option limits activities within a 100-mile radius of any location where the former employee had particular customers or performed services on behalf of LexisNexis. VC, Ex. 2 ¶ 3.3.1. The second limitation is based on the locations of all of LexisNexis's offices. VC, Ex. 2 ¶ 3.3.2. The third is based on the states where LexisNexis does business. VC, Ex. 2 ¶ 3.3.3. The fourth is based on the foreign countries where LexisNexis does business. VC, Ex. 2 ¶ 3.3.4. Importantly, these options for a geographic limitation should not be read together, but disjunctively, as indicated by the term "or" between each option. Of these options, the first applies most readily to Colangelo. It is clearly reasonable because it is

directly related to Colangelo's activities on behalf of LexisNexis—developing clientele and expanding market share—and it is limited to those areas in which Colangelo actually operated. In fact, one federal court has already impliedly approved this very restriction as reasonable when applied to a sales employee. *See* Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999) (applying Ohio law to modify the geographic restrictions in a prior iteration of the LexisNexis restrictive covenant to make them comparable to the restrictions in Paragraph 3.3.1 of the revised version that Colangelo signed).

In addition to the restrictions being reasonable, they do not impose any undue hardship on Colangelo. He is well-trained and very experienced in the areas of sales, marketing, and management and can readily find employment in any of these fields. In fact, it was Colangelo's own statement that he had found employment servicing commercial, rather than government, customers that initially misled the LN Group into thinking that he was not leaving to take employment in violation of his Agreement. Further, the Agreement is not injurious to the public. By restricting Colangelo's employment in businesses competitive with the business conducted by LexisNexis and its affiliates in a specific geographic area for only one year, the Agreement does not withhold Colangelo from public service or negatively impact any market conditions. The two commercial entities LocatePlus and the LN Group will continue to compete against each other as they have for years, and the public will continue to benefit from this competition by way of innovation and competitive pricing. In sum, all of the factors to be considered when determining the validity of a restrictive covenant under Ohio law weigh in favor of enforcement of the Agreement.

### 2. Colangelo Breached the Agreement.

It is undisputed that Colangelo is currently employed by LocatePlus, that LocatePlus provides services in the relevant geographical area, and that LocatePlus conducts a business in direct competition with the business activities of LexisNexis and its affiliates as they were conducted when Colangelo was an employee of LexisNexis. Thus, he is in violation of the Agreement. Accordingly, the LN Group is substantially likely to succeed in its action to enjoin Colangelo from further action in breach of his Agreement.

### C. The LN Group will suffer irreparable harm in the absence of a temporary injunction because Colangelo will use and disclose to LocatePlus valuable trade secret information.

The LN Group will suffer imminent, irreparable harm because Colangelo has breached and continues to act in contravention of his duties under the Agreement. Under Ohio law, an employer "establishe[s] irreparable harm" if it shows that its former employee is in possession of its trade secrets. Levine, 548 N.E.2d at 271. The evidence already presented by the LN Group clearly establishes that Colangelo possesses and will continue to possess the LN Group's trade secrets.

Ohio Code Section 1333.61(D) defines a "trade secret" as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

As outlined above in the Facts section, Colangelo is in possession of significant amounts of LN Group information that meets this definition. Indeed, he downloaded a thumb drive and external hard drive and burned to CD-ROM and took with him countless electronic files containing some of the LN Group's most important confidential information and trade secrets. Given such conduct, any argument that the LN Group has not shown irreparable harm could not withstand even cursory scrutiny.

Regardless, Colangelo's extensive knowledge of the LN Group's marketing strategy, strengths and weaknesses, pricing structures, profit margins, customer needs, product developments, acquisition strategies, and other highly sensitive business information, alone, constitutes sufficient evidence of irreparable harm to justify an injunction. See e.g., Levine, 548 N.E.2d at 271; Hoover Transp. Services, Inc. v. Frye, 77 Fed. App'x 776, 785 (6th Cir. 2003). Indeed, the stunning extent of

the confidential information and trade secrets that the LN Group has already discovered that Colangelo took establishes that this threat of harm will continue even if he returned it all.

### D. The LN Group is likely to succeed on the merits of its claim for misappropriation of trade secrets.

To establish a violation of the Florida Trade Secrets Act, the LN Group must show (1) information constituting a trade secret; and (2) actual or threatened misappropriation of that information. See Fla. Stat. §§ 688.002, 688.003. The evidence the LN Group presents with their motion and this memorandum establishes that Colangelo had extensive knowledge of and access to the LN Group's trade secrets, that the LN Group took reasonable measures to protect those trade secrets, and that Colangelo has misappropriated or threatens to misappropriate them through suruptitiously downloading them, burning them to CD-ROM, and other means. Consequently, the LN Group easily satisfies the requisite standard.

#### 1. The information Colangelo possesses and will continue to possess constitutes the LN Group's trade secrets.

Through his employment with NexisLexis and, more importantly, through his downloading, burning to CD-ROM, and otherwise unlawful taking of LN Group confidential information during his final days of employment, Colangelo possesses and will continue to possess LN Group trade secrets. Florida's Uniform Trade Secrets Act defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. §688.002(4). The executive-level information Colangelo possesses and has misappropriated meets this definition.

Florida law specifically recognizes that unique and specialized communication, organization and delivery methods; financial and pricing information; and customer information are trade secrets, as long as they have independent value and efforts are made to maintain their secrecy. *See, e.g.,*

Pharmerica, Inc. v. Arledge, 2007 WL 865510 at *6 (M.D. Fla. Mar. 21, 2007) (Slip Op.) ("[I]nformation pertaining to (a) the development of PharMerica's 'hub and spoke' distribution system and paper-less communication system with its nursing home customers, (b) the development and implementation of PharMerica's specialized Quality Management Program, and (c) pricing, especially for PharMerica's major corporate clients, constitutes trade secrets as defined in § 688.002 of the Florida Statutes."); Unistar Corp. v. Child, 415 So.2d 733, 734 (Fla. 1982) (holding that a customer list qualifies as a trade secret when it is the result of "considerable effort, knowledge, time, and expense on the part of the plaintiff"); East v. Aqua Gaming, Inc., 805 So.2d 932, 934 (Fla. 2d DCA 2001) (same). As John Cassiano's declaration evinces, the information Colangelo downloaded and burned to CD-ROM and took with him after he resigned exemplifies the type of information protected by the statute. Indeed, in just one of the hundreds, if not thousands, of files Colangelo took, a competitor—such as LocatePlus—would have a detailed road map of the LN Group's entire market strategy.

For that same reason, the information that Colangelo downloaded and burned to CD-ROM and generally had access to during his employment derives independent value in not being generally known. With this information, any competitor would know the LN Group's strategy, strengths and weaknesses, pricing points, and customer information. In short, the competitor would gain a significant competitive advantage over the LN Group.

Lastly, the LN Group employed significant measures to maintain the secrecy of its unique information organization, searching, and delivery processes; its financial and pricing data; and its customer data. Among other things, few employees are given access to such information, and the information exist primarily on secure, password-protected servers. See JC Decl. at ¶¶ 5-6. In addition, LexisNexis protects its information by requiring employees to agree to the strict non-disclosure provisions contained in the Agreement as a condition of employment. Based on these actions, and on the sensitive and valuable nature of this confidential information, the LN Group's unique processes for organizing, searching, and delivering information to its customers; its financial data; and its proprietary customer information constitute trade secrets under Florida law.

    2.    **<u>Colangelo has misappropriated and will continue to misappropriate the trade secrets of LexisNexis.</u>**

Florida law protects businesses against the actual **or threatened** misappropriation of their trade secrets. Florida's Uniform Trade Secrets Act provides that both "actual or threatened misappropriation may be enjoined." Fla. Stat. §688.003(1). The Act defines misappropriation as:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who . . . :
>
> \* \* \*
>
> 2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . :
>
> \* \* \*
>
> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Fla. Stat. §688.002(2). "Improper means" is defined as "**theft**, bribery, **misrepresentation, breach or inducement of a breach of a duty to maintain secrecy**, or espionage through electronic or other means." Fla. Stat. §688.002(2) (emphasis added).

Colangelo's conduct easily meets the statutory definition. As a LexisNexis employee who agreed to a non-disclosure agreement, he clearly acquired extensive amounts of LN Group trade secrets under circumstances giving rise to a duty to maintain their secrecy. Then, he purposely downloaded and otherwise took vast amounts of these trade secrets when he went to become the CEO and President of the LN Group's direct competitor. In short, his actions epitomize the type of conduct against which the statute protects. See Phamerica, 2007 WL 865510 at *4, *6.

Regardless, Colangelo's employment as LocatePlus' President and CEO would violate the statute even absent his blatant misappropriation. Given his extensive knowledge of LN Group trade secrets and the responsibilities of his new positions, he inevitably would have disclosed these trade secrets. Indeed, the SEC filing made by LocatePlus to disclose its hiring of Colangelo specifically

contains this information, which was not previously available to the public, which was kept scrupulously secret by LexisNexis, and which previously derived economic benefit by virtue of its being kept secret. *See* Fla. Stat. §688.002(4).

Florida's Uniform Trade Secrets Act permits a court to enjoin "actual **or threatened misappropriation**."Fla. Stat. §688.003(1) (emphasis added). Courts addressing this provision of the Florida Trade Secrets Act have made it clear that a plaintiff need not prove actual use of the secret to obtain an injunction. In Thomas v. Alloy Fasteners, Inc., 664 So.2d 59 (Fla. 5th DCA 1995), an employee left his employment to work for a competitor and took with him confidential information about his former employer's pricing and profit structure. The former employer obtained a temporary injunction, and the employee appealed on the grounds that there had been no proof he actually used the confidential information at his new job. The Court of Appeal flatly rejected this argument:

> We note that conspicuously absent from [the Uniform Trade Secrets Act] is any requirement that the trade secret first be used before its use can be enjoined. Clearly a threatened misappropriation of trade secrets may be enjoined.

664 So.2d at 60 (citing Fla. Stat §688.003 (1993)).

Florida courts have clearly and specifically recognized that threatened misappropriation can occur, and should be enjoined, when a person's employment with a competitor will inevitably result in the disclosure of trade secrets. In Fountain v. Hudson Cush-N-Foam Corp., 122 So.2d 232 (Fla. 3d DCA 1960), the plaintiff, Hudson, manufactured and sold polyurethane foam products. Fountain had worked for Hudson as an assistant production supervisor and as a chief production manager. Fountain signed an agreement not to disclose Hudson's trade secrets, and not to compete with Hudson for one year after his employment terminated. After his resignation, Fountain sought work with a competitor. Hudson sued and obtained an injunction (1) prohibiting Fountain from working for the competitor and (2) preventing him from disclosing trade secrets.

On appeal, Fountain argued the non-compete clause was overbroad and sought to distinguish the prohibition against working from the prohibition against disclosure of trade secrets in the injunction. The court rejected this argument:

> Although the appellants have not attacked that portion of the temporary injunction enjoining the disclosure of trade secrets, nevertheless they seek to differentiate between a restrictive covenant against employment in a competitive business and the imparting of trade secrets to the new employer. Since Fountain's employment by

14

> the appellee was the occasion for his acquiring knowledge of the appellee's trade secrets and manufacturing processes, it would seem logical to assume that his employment by a competitor of the appellee would eventually result in a disclosure of this information . . . . In short, **we think that his knowledge of the trade secrets would be so entwined with his employment as to render ineffective an injunction directed only toward a prevention of disclosure.**

122 So.2d at 234; see also PepsiCo, Inc. v. Redmond, 1996 WL 3965 at *18 (N.D. Ill. 1996) (relying in part on Fountain as persuasive authority for imposing an injunction based on inevitable disclosure). Clearly, Colangelo has misappropriated and will continue to misappropriate the LN Group's trade secrets.

### E. The LN Group will suffer irreparable injury if a injunctive relief is not awarded.

Florida law presumes that the misappropriation of trade secrets causes irreparable harm. In Dotolo v. Schouten, 426 So.2d 1013 (Fla. 2d DCA 1983), a manufacturer sued one of its distributors to prevent the use of a proprietary manufacturing formula. Reversing the Circuit Court's denial of an injunction, the Court of Appeal held that irreparable harm is presumed in the face of trade secret misappropriation:

> The appellants contend that injunctive relief is the only complete and adequate remedy to stop the appellees' continuing misappropriation of their secret formula. We agree. They argue that **irreparable harm and inadequate remedy at law should be presumed in an action for injunctive relief with respect to the misappropriation of a trade secret.** We agree.

426 So.2d at 1015 (emphasis added). See also Fla. Stat. §542.33(2)(a)(1995).

Other courts agree with this conclusion. See, e.g., Longwood Elastomers, Inc. v. Ludall Manufacturing, Co., 1994 WL 186015 at *6 (D. Kan. 1994) (stating that "[t]he court agrees that misappropriation of confidential information is a serious and irreparable harm for which the plaintiff is entitled to injunctive relief."). These concerns are especially important in the context of an employee misappropriating his employer's trade secrets. Plastic Sales & Manuf. Co. v. Thomas, 1989 WL 48880 at *4 (D. Kan 1989) (holding that "[t]here exists a threat of irreparable harm to Plastic Sales if this preliminary injunction is not granted, for the reason that despite his limited duties at E & E, Mr. Thomas will be in a position in which he will be able to make use of the confidential information he gained while employed at Plastic Sales to Plastic Sales's disadvantage."); see also

FMC Corp. v. Taiwan Tianan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (stating that "it is clear that the loss of trade secrets cannot be measured in money damages").

As outlined above, LocatePlus has already acquired some LN Group trade secrets because of Colangelo's actions and inevitably will acquire more trade secrets if he is allowed to continue working for LocatePlus. Thus, LexisNexis's likelihood of irreparable injury is manifest. "There can be no doubt of the present threat of disclosure in any case in which the transfer of employment is to a head-to-head competitor and the responsibilities in the employments are comparable." Emery Indus., Inc., 202 U.S.P.Q. at 834. Given Colangelo's extensive knowledge of the LN Group's important trade secrets, misappropriation of many of those secrets through his illicit downloads and burning to CD-ROM, and his position with LocatePlus, he will not be able to perform his duties to LocatePlus without disclosing or using the LN Group's proprietary information.

### F.     **Enjoining Colangelo serves the public interest and does not unduly burden Colangelo.**

The LN Group must establish (1) that the balance of equities weighs in favor of restraining Colangelo's business activities on behalf of LocatePlus; and (2) that issuance of a temporary restraining order would not be adverse to the public interest. Schiavo, 403 F.3d at 1225-26. LexisNexis satisfies these requirements as well.

First, a balancing of the parties' interests tips decisively towards the LN Group. The injury the LN Group will suffer if such an order is not issued is significant. Indeed, their trade secrets and other confidential information hang in the balance. "A trade secret once lost is, of course, lost forever." FMC Corp. v. Taiwan Tianan Giant Indus. Co, 730 F.2d 61, 63 (2d Cir. 1984). Courts have consistently recognized that the loss of trade secrets and confidential information causes irreparable harm. Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990); Heatron v. Shackelford, 898 F. Supp. 1491, 1502 (D. Kan. 1995). Colangelo is at this time literally running the business and developing the long-term competitive strategy of his new employer, LocatePlus, a direct competitor of the LN Group, and is inevitably using or disclosing the LN Group's valuable trade secrets, including the ones he improperly took before resigning.

In contrast, any potential harm to Colangelo would be minimal. Colangelo has numerous alternatives available to him within the occupation of sales, marketing and management, where he could utilize his education and experience without breaching his duties to the LN Group. Moreover,

he should not be allowed to profit from his own wrongdoing. Therefore, the equities weigh in favor of a temporary restraining order.

The public interest would be served, not damaged, by the issuance of a temporary restraining order in favor of the LN Group. The LN Group merely requests that this Court uphold and protect LexisNexis's statutory and contractual right to maintain the confidentiality of its trade secrets and other confidential business information, as well as its customer good will. Businesses must be free to develop trade secrets and to maintain confidential information without fear that their competitors can simply steal them by hiring away employees with knowledge of them. When misappropriations do occur, businesses must be able to obtain swift and effective injunctive relief. Similarly, businesses must have the ability to develop customers and to generate good will among such customers without the fear that the fruits of such efforts will be pirated from them when their high-level employees leave. Moreover, "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." Perro, 934 F. Supp. at 891. Thus, the temporary restraining order that LexisNexis seeks is not adverse to the public interest but actually advances this interest.

## IV. CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court enter an Order temporarily restraining Colangelo from (i) becoming or remaining employed by LocatePlus, or (ii) using or disclosing any trade secret of the LN Group and (iii) requiring that Colangelo return any LN Group property, trade secrets, or other confidential information in his or LocatePlus' possession, such Order to eventually become a permanent injunction after further proceedings.

Respectfully submitted this 15th day of June, 2007,

McGUIREWOODS, LLP

s/Scott S. Cairns
Scott S. Cairns
Florida Bar No: 0037729
Scott R. Bauries
Florida Bar No.: 0014968
50 North Laura Street, Suite 3300
Jacksonville, Florida 32202
(904) 798-3223

>Attorneys for Plaintiffs, LexisNexis Risk and Information Analytics, Inc., Reed Elsevier, Inc., and Seisint, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. No attorney has entered an appearance yet on behalf of Defendant Colangelo, but an attorney has been corresponding on Colangelo's behalf. Accordingly, I further certify that upon receipt of the Court's Notice of Electronic Filing, I will serve a copy of the foregoing, as well as a copy of the Court's Notice, via facsimile to Maury S. Epner, Esq., Miller, Miller, & Canby, 200-B Monroe Street, Rockville, MD 20850, Facsimile (301) 762-6044.

>s/Scott S. Cairns
>
>Attorney

\Lexis/Colangelo TRO Memorandum in Support of Motion #4618460 (v.5).doc